UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. _____

| | |
|---|---|
| ROCKET OUTDOOR ADVERTISING, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| CITY OF POMPANO BEACH, FLORIDA, | ) ) |
| Defendant. | ) )   **JURY TRIAL DEMANDED** |

**COMPLAINT AND REQUEST FOR DECLARATORY,
INJUNCTIVE, AND EQUITABLE RELIEF**

COMES NOW Plaintiff Rocket Outdoor Advertising, LLC ("Rocket"), by and through its undersigned counsel, and files this Complaint and Request for Declaratory, Injunctive, and Equitable Relief, showing the Court as follows:

**PARTIES**

1. Rocket is a Florida limited liability company. Rocket is in the business of erecting and operating signs that are utilized by businesses, churches, organizations, and individuals to communicate commercial and noncommercial messages. The owners of Rocket have been in the sign industry for decades and have developed and operated dozens of signs in Florida and several other states.

2. Defendant City of Pompano Beach, Florida ("City") is a municipal corporation located in Broward County and organized under the laws of the State of Florida. As explained herein, the City has enacted and enforced sign legislation and informal policies that have impermissibly infringed upon the federal and state constitutional rights of Rocket and many

others.

## JURISDICTION AND VENUE

3.      Rocket's federal law claims arise under the First and Fourteenth Amendments to the United States Constitution and Section 1983 of the Civil Rights Act.  This Court has original jurisdiction pursuant to 28 U.S.C. § 1331.  Those claims which are brought pursuant to the Florida Constitution are related in such a way to Plaintiff's federal law claims that this Court has supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367.

4.      The City is subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 1391 and venue is proper as to the City under the facts and circumstances as alleged herein.

## FACTUAL ALLEGATIONS

**I.     The Sign Code.**

5.      The City has enacted a Sign Code to govern signs in the City.  A true and correct copy of this Code is attached hereto as Exhibit A.

   A.    The Costly and Discretionary Permitting Process.

6.      Except in the case of a few specific categories of exempt signs, those wishing to post signs must submit an application to the City and obtain a permit prior to posting.  See Sign Code, § 156.13(A).

7.      Those wishing to apply for signs must pay large sign permit fees which can be as much as several thousand dollars per sign.  Id. at §§ 156.13(A), 156.15.

8.      The Code specifies certain information that must accompany sign permit applications, but gives wide latitude to City officials to require unspecified information if they deem fit.  See Sign Code, § 156.13(B) (applications "shall include, but not be limited to, the following [information])."  As explained herein, the City uses this discretion to discourage

applications for signs bearing disfavored content.

9. If an applied-for sign complies with the Code it is to be issued a permit. Id. at § 156.13(C). If it does not comply, the application is to be denied. Id.

10. Pursuant to the Sign Code, the City has 30 days from the date an application is submitted to approve or deny it. Id. at § 156.13(D)(1). If the application is denied, the denial must be reduced to a written decision and sent to the applicant via certified mail. Id. If the City fails to render a timely decision, the proposed sign may be erected, but only "until such time as such application is denied and all appeals, if any, are exhausted." Id.

11. In the case of signs which do not comply with the Sign Code, various City officials are given discretion to approve them if they see fit. For example, Section 156.24 gives the Architectural Appearance Committee discretion to approve additional signs as part of a "uniform sign program" for large commercial and industrial developments. See also id. at § 156.04(I). The only criteria for such additional signage are wholly subjective. See Sign Code, § 156.24 (approved signs must be "within the bounds of sound architectural practice and planning and in harmony with the general purpose and intent of the Uniform Sign Program" which is to "encourage creativity and diversity for signage").

12. The Architectural Appearance Committee is also given discretion to approve additional signage in the Atlantic Boulevard Overlay District. See Sign Code, § 156.08. For example, the Committee is authorized to approve murals if they are deemed to be "appropriate[] and consisten[t] with the district objectives." Id. Moreover, the Zoning Administrator is given discretion to determine whether a sign qualifies as a mural (i.e., whether it "depicts a scene or event of natural, social, cultural, or historic significance"). Id. at § 156.03.

13. The Architectural Appearance Committee is also given discretion to approve large

signs (up to 600 square feet in area and 30 feet in height) adjacent to limited access highways for specified properties and to dictate the content of such signs.  See Sign Code, § 156.07(E)(2)-(4).

14. The Code allows large "signs containing information for the benefit of the public . . . anywhere within the City limits."  See Sign Code, § 156.11(B).  Since whether a sign's content benefits the public is wholly a subjective inquiry, City officials are necessarily given discretion to determine whether a sign is allowed by this provision.

B. The Content-Based Regulations.

15. The Sign Code regulates based on the content of a sign's message.  For example, the Code prohibits "billboards and general advertising signs," which are defined purely based on the content displayed, namely messages that advertise "merchandise, services, or entertainment, sold, produced, manufactured, or furnished at a place other than the location of the sign."  See Sign Code, §§ 156.03, 156.12(E).

16. The Code also prohibits "off-premise" signs, which are defined as signs bearing messages unrelated to the premises where the sign is located.  See Sign Code, §§ 156.03, 156.12(G).  The Code specifically exempts certain favored signs posted on City property from this definition.  Id. at § 156.03 (exempting signs installed on City property "as part of the Planned Commercial Development at Harbor Village located on the north side of East Atlantic Boulevard in between Northeast 26 Avenue and Northeast 28 Avenue").

17. The Code defines "mural" as "[a]rtwork applied to the fence or wall of a building that covers all or substantially all of the wall and depicts a scene or event of natural, social, cultural, or historic significance."  See Sign Code, § 156.03.  Murals are only allowed in certain districts and then only at the discretion of the Architectural Appearance Committee.  Id. at § 156.08.

18.     The Code allows "signs containing information for the benefit of the public," which is necessarily a content-based (and wholly discretionary) inquiry.  See Sign Code, 156.11(B).

19.     The Code also exempts signs bearing favored messages from certain regulations. See Sign Code, §§ 156.02(A); 156.14.  For example, "official directional and traffic signs" are wholly exempt from all regulations.  Id. at § 156.02(A).  Moreover, "[s]igns installed under the direction of municipal, county, state, or federal flag, agencies" are exempt from the permitting requirement.  Id. at § 156.14(I).

20.     In short, the Sign Code regulates not based on objective, content-neutral criteria, but rather on the content-based, subjective whims of City officials.

## II.     Rocket's Applications and the City's Response.

21.      Rocket is in the business of developing signs to be used for the dissemination of both commercial and noncommercial speech.  Such signs are often the cheapest and most targeted method for individuals, small businesses, and local organizations to get their messages out to the community.  In addition, such signs are a powerful medium for the advertising of ideological, religious, and political ideas.

22.     Rocket desires to erect and operate signs (including murals) throughout the City's business, commercial, and industrial zoning districts, including the Atlantic Boulevard Overlay District.  Indeed, the City has several corridors that are ideal for such signage because the signs will have no impact on residential areas but will be extremely effective at directing motorists to local businesses and organizations and informing them about important issues and events.

23.     Rocket has spent substantial time and effort researching the areas of the City that are appropriate for new signage.  To date, as a result of these efforts, the owners of interests in

four parcels of real property in the City have authorized Rocket to apply for signs on the properties. The properties at issue are adjacent to some of the City's most heavily trafficked commercial corridors.

24. All of the proposed sign locations are fully compliant with the Florida Building Code and the State of Florida's laws and regulations regarding signs. The State regulates such signs for purposes of safety and aesthetics and has codified regulations that would specifically allow each of Rocket's proposed signs. For example, the size, spacing, and zoning of the proposed signs have been specifically authorized in the State's regulations.

25. Pursuant to the City's Sign Code, Rocket attempted to submit four sign application packages to the City on September 22, 2015.

26. The first three sign applications sought permission to post signs at (a) 480 S.W. 9th Terrace (reading to Interstate 95) ("the I-95 Sign"), (b) 1390 S. Federal Highway ("the Federal Sign"), and (c) 1301 S.W. 26th Avenue (reading to S. Pompano Parkway) ("the Pompano Sign"). Rocket intended to use each sign to display various commercial and noncommercial messages for the benefit of the public.

27. The last application sought permission to install a mural on a side of the building located at 2751 W. Atlantic Boulevard ("the Mural"). Rocket intended to use the Mural to depict various scenes or events of natural, social, cultural, or historic significance.

28. At the time Rocket submitted its applications, City employees reviewed the applications to ensure they were complete.

29. Relying on the discretion afforded by Section 156.13(B) of the Sign Code, the City employees informed Rocket that the applications were incomplete and additional information was needed, including a completed zoning compliance application and updated

contractor information. Rocket spent an additional two days obtaining these materials.

30. On September 23, 2015, Rocket amended its applications to include the additional requested information. Each application package contained all information and documentation specifically required by the Code, mentioned on the City's application forms or its list of "Sign Review Criteria," or specifically requested by City employees after reviewing the applications.

31. After accepting the applications for processing, the City demanded that Rocket pay non-refundable permit fees of $5,850 for the I-95 Sign and $3,250 for each of the Federal and Pompano Signs. These required permitting fees are nonrefundable and are calculated based on the projected cost of the sign that is applied for, not the City's administrative costs associated with processing each application.

32. Rocket was forced to pay these fees to have its applications processed.

33. On September 29, 2015, City employee Daniel Keester informed Rocket that the Mural would need to be approved by the Architectural Appearance Committee as part of a modification to the property's Uniform Sign Plan. Moreover, Mr. Keester also informed Rocket that the Mural did not qualify as a "mural" under the Sign Code and would thus need to be approved by the Architectural Appearance Committee as an amendment to the Uniform Sign Plan and that it would, in any case, be limited to on-premise content.

34. More than 30 days have elapsed since Rocket submitted its applications for the I-95, Federal, and Pompano Signs. Yet, Rocket still has not received official certified mail notification from the City as to whether its applications for these signs have been approved or denied.

35. Although no official decision has been communicated, Rocket believes its applications have been denied. Using the permit numbers assigned to the I-95, Federal, and

Pompano sign applications, Rocket has logged into the City's website and noted that each application has been "REJECTED."

36. The website lists the purported bases for the City's rejections under a heading entitled "Status & Notes." Among the reasons listed are that the signs qualify as "billboards" or "off-premise" signs and are thus barred by Section 156.12 of the Sign Code.

37. The "Status & Notes" section of the City's website also alleges that the applications are incomplete because they fail to contain various items, such as a "special inspector form," "electrical requirements," or landscaping plans. None of this information is required by the Sign Code, nor was it sought by the City after reviewing the applications in detail at the time of submission. Clearly, the City is using the discretion afforded by Section 156.13(B) to discourage Rocket from pursuing its applications.

38. The City has also used its costly permitting fees as a manner of discouraging Rocket from pursuing its applications. Indeed, the "Status & Notes" section of the website advises Rocket that "additional zoning reviews after the first two" will require new permitting fees. As previously noted, these fees are several thousand dollars.

39. In accordance with the Sign Code, the City's deadline to respond to the Mural application elapsed on October 23, 2015. However, there is no indication on the City's website that the Architectural Appearance Committee has acted on the application. However, this process is wholly subjective (see ¶¶ 11-14, 17, supra) and as such, Rocket need not wait for a decision before challenging it on facial grounds in this Court. E.g., City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 755-56 (1988).

40. As a result of the City's actions (and inaction), Rocket has been unable to post the requested signs and mural. Consequently, both Rocket and those who would display content on

its signs and mural have not been able to disseminate desired commercial and noncommercial messages to the City's residents and visitors. The loss of such speech activity – even for one day – is irreparable as a matter of law. This deprivation, however, has also caused Rocket and the landowners for each proposed location substantial quantifiable financial damage.

COUNT ONE

THE SIGN CODE VIOLATES THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 4 OF THE FLORIDA CONSTITUTION

41.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 40 above as if set forth verbatim herein.

42.    The Sign Code violates the First Amendment to the United States Constitution and Article I, Section 4 of the Florida Constitution, both facially and as applied, in several ways:

(a)    the Sign Code is impermissibly content-based (e.g., ¶¶ 15-20, supra) and cannot survive strict scrutiny (e.g., Reed v. Town of Gilbert, 576 U.S. __, 135 S. Ct. 2218 (2015));

(b)    the Sign Code grants unfettered discretion to City officials, including but not limited to the Architectural Appearance Committee, the Zoning Administrator, and the Building Division, to license speech (e.g., ¶¶ 8, 11-14, 17, supra) (e.g., Forsyth County v. Nationalist Movement, 505 U.S. 123, 130 (1992); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51 (1969); Miami Herald Publ'g Co. v. City of Hallandale, 734 F.2d 666, 669 (11th Cir. 1984));

(c)    the Sign Code's procedural safeguards on the permitting process (e.g., ¶ 10, supra), which lack sufficient "teeth" (i.e., an unfettered right to operate) are constitutionally insufficient (e.g., Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1272-74 (11th Cir. 2005); Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358 (11th Cir. 1999));

9

(d) the Sign Code is an impermissible commercial speech restriction because it fails to directly advance a substantial governmental interest and reaches further than necessary to accomplish the given objective (e.g., ¶¶ 15-20, supra) (e.g., Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 566 (1980)); and

(e) the Sign Code imposes costly permitting fees that amount to an impermissible tax on the exercise of Rocket's free speech rights (e.g., ¶¶ 7, 31, supra) (e.g., Cox v. New Hampshire, 312 U.S. 569 (1941); Murdock v. Pennsylvania, 319 U.S. 105 (1943)).

43. Because these aspects of the City's Sign Code are constitutionally invalid and inseparable from the remainder of the Code, this Court should declare the Sign Code invalid in its entirety. E.g., Solantic, 410 F.3d at 1274. Because no valid regulation prohibited Rocket's requested signs, the City should be ordered to permit Rocket to post the signs.

44. In addition, pursuant to 42 U.S.C. § 1983, Plaintiff is entitled to compensation for the damages it has suffered as a result of the City's unconstitutional Sign Code and, pursuant to 42 U.S.C. § 1988, reimbursement for all reasonable costs, including attorneys' fees, of bringing this lawsuit to assert its and others' constitutional rights.

## COUNT TWO

### THE SIGN CODE VIOLATES THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 9 OF THE FLORIDA CONSTITUTION

45. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 40 above as if set forth verbatim herein.

46. The Sign Code favors the speech of certain entities and property owners, including the City and its officials, while prohibiting speech by other entities that would be no more detrimental to any legitimate governmental interest (e.g., ¶¶ 16-19, supra). Such favoritism

has denied Rocket and others equal protection under the law and thus violates both the Fourteenth Amendment to the United States Constitution and Article I, Section 9 of the Florida Constitution, both facially and as applied.  E.g., Rosenberger v. Rectors and Visitors of Univ. of Va., 515 U.S. 819, 828-29 (1995); Advantage Media, LLC v. City of Hopkins, 379 F. Supp. 2d 1030, 1046 (D. Minn. 2005).

47.     Because this aspect of the City's Sign Code is constitutionally invalid and inseparable from the remainder of the regulations, this Court should declare the Sign Code invalid in its entirety.  Because no valid regulation prohibited Rocket's requested signs, the City should be ordered to permit Rocket to post the signs.

48.     In addition, pursuant to 42 U.S.C. § 1983, Plaintiff is entitled to compensation for the damages it has suffered as a result of the City's unconstitutional Sign Code and, pursuant to 42 U.S.C. § 1988, reimbursement for all reasonable costs, including attorneys' fees, of bringing this lawsuit to assert its and others' constitutional rights.

WHEREFORE, Plaintiff Rocket Outdoor Advertising, LLC demands a jury trial on all claims so triable and prays for judgment as follows:

(1)     Declaratory relief as specified herein;

(2)     An order preliminarily enjoining enforcement of the City's Sign Code;

(3)     An order permanently enjoining enforcement of the City's Sign Code;

(4)     A declaration that the City's Sign Code is unconstitutional and otherwise invalid;

(5)     An order compelling the City to permit Plaintiff to post and operate signs pursuant to the above-referenced applications;

(6)     An order compelling the City to provide any and all necessary certification to the State of Florida;

(7) An award of all such actual, consequential, general, presumed, nominal, and punitive damages as a jury determines are appropriate;

(8) Reimbursement for the full amount of Plaintiff's reasonable attorneys' fees and costs of bringing and prosecuting this action; and

(9) Such other and further relief as the Court may deem just and equitable.

DATED this 30th day of October, 2015.

Respectfully submitted,

| **KOPELOWITZ OSTROW PA** | **WEBB, KLASE & LEMOND, LLC** |
|---|---|
| */s/ Jonathan M. Streisfeld* <br> Jonathan M. Streisfeld <br> Florida Bar No. 117447 <br><br> One West Las Olas Blvd., Suite 500 <br> Fort Lauderdale, FL 33301 <br> (954) 525-4100 <br> (954) 525-4300 (fax) <br> streisfeld@kolawyers.com | E. Adam Webb* <br> Georgia State Bar No. 743910 <br> Matthew C. Klase* <br> Georgia State Bar No. 141903 <br> 1900 The Exchange, S.E., Suite 480 <br> Atlanta, GA 30339 <br> (770) 444-0773 <br> (770) 217-9950 (fax) <br> Adam@WebbLLC.com <br> Matt@WebbLLC.com <br> *Application for *Pro Hac Vice* Admission to be submitted prior to first appearance |

*Attorneys for Plaintiff Rocket Outdoor Advertising, LLC*